Name: Ted Salois
Address: 4285 Maple Ave.. La Mesa, CA 91941
Telephone Phone: (619) 741-5380 (h) or (619) 253-9936 (c)
Email: tedsalois@hotmail.com

FILED

17 SEP -7 AM 11: 58

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: **ORIGINAL**

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ted Salois<br><br>                    Plaintiff<br><br>           v.<br><br>Medifast, Inc.<br>Jason Enterprises, Inc.<br>Jason Pharmaceuticals, Inc.<br><br>                    Defendants | Case No.: **'17 CV 1810 GPC NLS**<br><br>**COMPLAINT**<br><br>**DEMAND FOR DECLARATORY AND INJUNCTIVE RELIEF 28 U.S.C §2201 FOR NOMINATIVE FAIR USE OF TRADEMARK AND UNFAIR COMPETITION 15 U.S.C. §1125, CAL. BUS. & PROF. CODE §17200, COMPENSATORY AND EXEMPLARY DAMAGES AND**<br><br>**DEMAND FOR JURY TRIAL** |

## Jurisdiction

1. This court has jurisdiction under 28 U.S.C. § 2201. Federal question

jurisdiction arises pursuant to 15 U.S.C. § 1125.

> 2. The district and territorial courts of the United States shall have original jurisdiction... of all actions arising under this chapter, without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties.

15 U.S.C. § 1121(a)

> 3. The district courts shall have original jurisdiction of any civil
> action arising under any Act of Congress relating to patents, plant
> variety protection, copyrights and trademarks.   No State court shall
> have jurisdiction over any claim for relief arising under any Act of
> Congress relating to patents, plant variety protection, or copyrights.

28 U.S.C. § 1338

4. The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trademark laws. *Id.*

5. This controversy arises from Defendant Diet Company's explicit charge that Mr. Salois is making infringing use of its trademarked name and threats to pursue all "legal recourse and remedies available to trademark owners under federal and state law." (Exhibits 2, 6, and 11)  The allegation and intimation of retaliatory legal action are sufficient to warrant the court's declaration of the parties' rights.

> 6. (W)e cannot read the Declaratory Judgment Act so narrowly as to
> require that a party actually be confronted with an express threat of
> litigation to meet the requirements of an actual case or controversy.
> Such a requirement would utterly defeat the purpose of the
> Declaratory Judgment Act...

*Goodyear Tire Rubber v. Releasomers*, 824 F.2d 953, 956  (Fed. Cir. 1987)

7. "If defendant has expressly charged a current activity of the plaintiff as an infringement, there is clearly an actual controversy, certainty has rendered apprehension irrelevant, and one need say no more." *Arrowhead Indus. Water, Inc. v. Ecolochem*, 846 F.2d 731, 736 (Fed. Cir. 1988)

8. Defendant Diet Company has expressly charged Mr. Salois with trademark infringement for use of its registered name on a book currently on the market.  The charge and threats were made in not one but three communications with Mr. Salois.  Thus, requirements for jurisdiction have been met.

## Venue

9. Venue is proper pursuant to 28 U.S.C. § 1391(d) because defendant corporation advertises and sells its packaged diet foods to district residents through several local offices and via the internet, and plaintiff lives in this district.

## Parties

10. Plaintiff Ted Salois resides at 4285 Maple Ave., La Mesa, California. 91941.  Defendant Medifast, Inc., and its subsidiaries, Jason Enterprises, Inc., and Jason Pharmaceuticals, Inc., are headquartered at 11445 Cronhill Drive, Owings Mills, Maryland, 21117.

## Standing, Existing Controversy

11. The Lanham Act contains no statute of limitations, so timing is governed by state requirements under Cal. Bus. Prof. Code §§ 14330 and 14335. *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 997 (9th Cir. 2006)

12. The California statute of limitations for … state trademark infringement and/or dilution claims, and state unfair competition claims is four years. *Id.*

13. California statute of limitations is two years for claims of intentional interference with a contractual relationship and intentional interference with an economic advantage.  Cal. Civ. Proc. Code § 339, subd. (1); *Tu-Vu Drive-In Corp. v. Davies*, 66 Cal.2d 435, 437

14. This controversy began December 21, 2015, when Defendant Diet Company charged Mr. Salois with trademark infringement (Exhibit 2).  It made the accusation a second time March 11, 2016 (Exhibit 6), and a third time February 9, 2017 (Exhibit 11).  Defendant Diet Company's action that severed Mr. Salois' book sales channel with Amazon.com took place in March 2016 and the damaging results remain in effect.  Thus, the controversy is ripe and fresh.

1   15. Even if Defendant Diet Company concedes that Mr. Salois' use of its

2   mark name is expressly permitted by law, the court should hear the case and make

3   the declaration prayed for in Claim I because Mr. Salois' additional claims stem

4   directly from it. A resolution on the mark's Nominative Fair Use is a prerequisite

5   for the other claims' proper adjudication.

6     16. The test for mootness in cases such as this is a stringent one.
7     Mere voluntary cessation of allegedly illegal conduct does not
  moot a case; if it did, the courts would be compelled to leave "[t]he
8     defendant... free to return to his old ways."

9   *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982), citing *United*

10   *States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953)

11   17. Any covenant not to sue offered by Defendant Diet Company would

12   be unable to address the numerous different uses Mr. Salois might make of the

13   mark name in the future. Mr. Salois is an author with plans for more books on the

14   subject of diet and regularly writes articles that discuss his experience with the

15   named weight-loss program.

16   18. Regardless of Claim I, standing remains through Claim II for Lanham

17   Act unfair competition.

18   19. Where one of the several issues presented becomes moot, the remaining

19   live issues supply the constitutional requirement of a case or controversy. *Powell*

20   *v. McCormack*, 395 U.S. 486, 497 (1969)

21   20. A court may grant declaratory relief even though it chooses not to

22   issue an injunction or mandamus. A declaratory judgment can then be used as a

23   predicate to further relief, including an injunction. *Id*. at 499, citing 28 U.S.C. §

24   2202

25

26   **Statement of Facts**

27   21. After many years of battling excessive body fat, Mr. Ted Salois took

28   a chance on a prepackaged-food diet plan called Medifast. It had a relatively

1   high price tag, but Mr. Salois believed pain of the lofty expense would contribute

2   positively to his level of commitment.

3       22. To Mr. Salois' surprise, the program worked amazingly well.  Although

4   there were difficulties and obstacles that needed conquering, he lost 68 pounds in

5   fewer than six months.  He was very excited about his success.  He was enthused

6   to tell others about the diet and help them accomplish significant weight loss.

7       23. He knew from his journey to thin that achieving a proper goal weight

8   was more complicated than a slogan like "eat the food and drop the pounds."

9   So, **Mr. Salois turned his daily journal into a review of the diet**.  The book

10   assessed the program's strengths; it noted a couple of weaknesses; it highlighted

11   lessons he learned and provided tips to help people leap the hurdles he had faced.

12       24. A catchy and informative title was created to alert the public of the

13   book's content.  The book's cover was designed to read: **Medifast & Me & You:**

14   **Unauthorized Evaluation** (Exhibit 1).  Mr. Salois published the 254-page book

15   (Sept. 2015) and made it available for sale on-demand through createspace.com,

16   a print-publication arm of the online retailer Amazon.com.

17       25. Mr. Salois presented the book to the local Medifast office in El Cajon,

18   California.  The office manager, Mary Harris, purchased several copies and

19   put two on display in the office reception area.  Customers viewed them while

20   waiting for their appointments with nutritionists.  According to staff, the contact

21   generated interest and sales of the book.

22       26. Mr. Salois then contacted marketing agent Michael Sedge who agreed

23   the book was a great source of information for people researching to determine if

24   the program was right for them and also as a guide to people already engaged in

25   the diet.

26       27. In October of 2015, Mr. Sedge contacted Medifast's Brian Kagen,

27   vice president of marketing, to see if the corporation would be interested in

28   offering the book to new customers and/or stocking it in program offices around

1  the country.  It also was suggested the author could promote the book and

2  diet simultaneously through book signings, weight-loss seminars and other

3  appropriate activities.

4      28. Mr. Sedge reported that Mr. Kagen said he was very interested and

5  asked that Mr. Salois send a copy of the book so it could be shared with other

6  departments in the corporate office before any negotiations could begin.

7      29. Immediately after receiving the book, Mr. Kagen informed Mr. Sedge

8  that the corporate legal department would be contacting Mr. Salois posthaste to

9  deal with the trademark infringing use of the word Medifast.

10      30. Over the next year, communications from Defendant Diet Company

11  to Mr. Salois came only in the form of certified letter.  All were threats of legal

12  action for naming the diet program in Mr. Salois' review book.

13      31. The first letter (Dec. 2015) was from Medifast in-house counsel,

14  Emarie Payne (Exhibit 2).  It claimed the book's use of the word Medifast was

15  trademark infringement.  It called attention to several characteristics the company

16  saw as problematic: 1) the Medifast name was used without permission,  2) a

17  trademark symbol ® was missing from the word Medifast and 3) the words

18  "unauthorized evaluation" were not visible enough. **The letter demanded the**

19  **word Medifast be removed from the book's title**.

20      32. Mr. Salois reconfigured the cover by adding the trademark symbol

21  ® to the word Medifast and enlarging and using a brighter color for the words

22  "unauthorized evaluation."  The newer (second) version (Exhibit 3) was uploaded

23  to replace the "unapproved" edition and a letter was sent to Ms. Payne noting

24  the changes.  Mr. Salois' (Jan. 7, 2016) response (Exhibit 4), however, informed

25  Ms. Payne that **the word Medifast had to remain because it was essential to**

26  **identify the subject of the review**.

27      33. Shortly thereafter, someone from Medifast headquarters made an

28  undisclosed claim under the Digital Millennium Copyright Act to get retailer

1  Amazon.com to remove the publication from its internet shelves (Exhibit 5).  The

2  retailer provided a name and email address (March 1, 2016) of the accuser, Jean

3  Keltner: jkeltner@choosemedifast.com, but no process of redress.

4      34. The next correspondence (March 11, 2016) Mr. Salois received (Exhibit

5  6) was from another attorney, an associate at Norton Rose Fulbright law firm in

6  Minnesota.  After stating use of the trademark symbol ® was improper, the letter

7  promised legal action against Mr. Salois if he did not cease offering the book to

8  the public.

9      35. With no resources or assistance to argue the matter formally, Mr. Salois

10  stopped offering the book for sale and sent a response (Exhibit 7) saying it was

11  no longer on the market (March 26, 2016).  He also began preparing an alternate

12  version of the book (Exhibit 8) to try to offer some beneficial information to

13  dieters without identifying the diet he had used for his success.

14      36. Simultaneously, Mr. Salois designed a new cover for the original

15  book with the diet identified.  He did it in a way that even more prominently

16  emphasized the lack of affiliation with the diet company and had absolutely no

17  potential for confusion.

18      37. The book's redesigned cover (Exhibit 9) screamed the absence of diet

19  company sponsorship and further ensured a situation of Nominative Fair Use

20  for which the diet company could have no argument.  The latest (third) edition

21  of the book, with continued use of an internal disclaimer page (Exhibit 10), was

22  relaunched on Amazon.com through a newly available channel (Kindle Direct

23  Publishing, Print), at least temporarily sidestepping the ban put in place by

24  Defendant Diet Company and Amazon.com on the previous editions.

25      38. Shortly thereafter (Feb. 9, 2017) a partner from Norton Rose Fulbright

26  in Canada sent a letter to Mr. Salois (Exhibit 11) threatening legal action if the

27  latest edition of the book wasn't immediately removed from the market.

28      39. Mr. Salois responded (March 11, 2017) (Exhibit 12) with a notation

1  that the book had been so configured as to absolutely ensure there was no chance

2  of confusion and, thus, the book's use of the name Medifast was legally permitted

3  under U.S. trademark law's Nominative Fair Use doctrine.

4      40. Mr. Salois' response also questioned Defendant Diet Company's

5  motivation in the matter, since the review was overwhelmingly positive. The

6  response also admitted that there was little else to be done since agreement

7  seemed impossible. Mr. Salois said he looked forward to having outside,

8  unbiased persons determine the proper resolution.

9      41. Mr. Salois then launched a website (Exhibit 13) to invite public

10  comment (Exhibit 14) on potential for confusion and try to attract legal counsel

11  who would volunteer to push back against the trademark bullying.

12      42. Mr. Salois was contacted (March 24, 2017) by Mr. Kent Coykendall

13  who said he is owner of seven Medifast offices in Southern California. Mr.

14  Coykendall said he had seen a copy of a news release on the issue (Exhibit 15)

15  and had looked over a copy of the book. Mr. Coykendall asked Mr. Salois what

16  problem the Medifast headquarters had expressed with the book. He said he

17  knew the lead counsel at Medifast in Maryland and would make contact to see if

18  the issue could be resolved. About two weeks later, Medifast in-house counselor

19  Payne contacted Mr. Salois by phone and expressed the company's further desires

20  for changes to the book cover, including the font selection, the font size, and the

21  order of wording, in effect, a complete change to the book's title.

22

23                                       **Claim I**

24          **Declaration of Nominative Fair Use**

25      **43. The court should find Mr. Salois' use of Defendant Diet Company's**

26  **trademarked word specifically permitted by law because its appearance on**

27  **the cover and inside a book reviewing Defendant Diet Company's weight-**

28  **loss program easily passes the Ninth Circuit Court's three-part test for**

**Nominative Fair Use, an affirmative defense to a charge of trademark**
**infringement under 15 U.S.C. §1125(a).**

> 44. The following shall not be actionable as trademark infringement: any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner. Also excluded are all forms of news reporting and news commentary.

15 U.S.C. § 1125(c)(3)(A)(ii) and (B)

45. The Nominative Fair Use analysis is appropriate where the mark is used to refer to the mark holder's product, even if the user's ultimate goal is to (feature) his own. *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002)

46. Mr. Salois' book uses Defendant Diet Company's mark name to refer to Defendant Diet Company's weight-loss program for the purpose of review, commentary and criticism. Thus, the test for Nominative Fair use is proper.

> 47. To qualify as Nominative Fair Use, first, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992)

48. (First Element) The Medifast diet program and its related food products are known by no other name. Trying to untangle an alternate snarl of words descriptive enough to inform the public which program and products were being reviewed would prove to be impractical and infeasible, if not impossible. Thus, the trademarked word Medifast is required to identify Defendant Diet Company's products for the purpose of evaluating and reporting on their effectiveness.

49. (Second Element) Mr. Salois used the trademarked name Medifast only in the book's title (Exhibit 9) and on a disclaimer page (Exhibit 10) that explains the book has no affiliation with, or sponsorship by, Defendant Diet Company.  Use of the name Medifast in the book's title and in large type on the cover is necessary to ensure the book's potential readers know immediately which diet program the book reviewed.  Use of the name in the title also ensures other references and record-keeping situations unambiguously relay the main topic of the work.

> 50. Prominent appearance of the trademarked name is no bar to finding it is Nominative Fair Use.  Even though the mark is displayed conspicuously, that is not enough (to be infringement).  Attention must be attracted to the word as a source of the product (if fair use is to be denied).

*Wonder Labs, Inc. v. Proctor & Gamble Co.*, 728 F. Supp. 1058 (S.D.N.Y. 1990)

51. *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992) is distinguished. STW and Quaker both manufactured beverages, with Quaker claiming it used STW's registered word-phrase as a descriptive term unrelated to the mark holder's product.

52. Identifying the diet prominently on the cover is important for quick communication to the book's potential readers.  Defendant Diet Company seems to have understood this when it named and published it's own book, "Medifast Diet, the secret is out, What physicians have always known about weight loss" (Exhibit 16), which targets the same audience as Mr. Salois' book.

53. While the trademarked name is the first word in Mr. Salois' book title and is in large, eye-catching type on the cover, it is unable to conjure thoughts of sponsorship because any such effect is glaringly countered with the equally attention-getting words "unauthorized evaluation" (Exhibit 9), which insist the work is unaffiliated with the mark holder.

54. Additionally, Defendant Diet Company has chosen a common font for

1   its mark name (Exhibit 17), so some similarities are unavoidable.  All block-letter

2   type faces fall into one of two categories: sans serif and serif.  Defendant Diet

3   Company has chosen the latter.  The world's most widely used serif font, Times

4   New Roman—the font used for this complaint—looks just like the one Defendant

5   Diet Company used for the mark.  All fonts with serifs will have commonality with

6   the mark.  Failure to select a less routine and more identifying appearance should

7   not result in Defendant Diet Company's expectation of protection in lettering style.

8       55. Defendant Diet Company registered its mark name using all capital

9   letters (Exhibit 17) without specifying any anticipated protection for the visual

10  design other than as combined with a caduceus symbol, which is conspicuously

11  absent from Mr. Salois' book.  Mr. Salois has taken care to differentiate his use

12  from the registered mark by presenting his book title in both upper and lower case

13  letters (Exhibit 9).

14      56. In actual usage, however, Defendant Diet Company employs a slanted

15  (italicized) lower case "f" while other letters in the mark word are displayed in

16  regular (upright) type, e.g., "Medi*f*ast."  This is clearly visible on the cover of

17  Defendant Diet Company's competing book (Exhibit 16).  Mr. Salois deliberately

18  avoided the identifying odd-angle style for the "f" in favor of all-standard, uniform

19  lettering on his book cover.

20      57. While  both parties' use of the mark share a common type face for most

21  of the word, substantial and sufficient visual differences and textual clarification

22  exist to ensure Mr. Salois' book cover creates no confusion about sponsorship.

23      58. Further references to the diet program throughout the review book use

24  generic terms, such as "the diet company," the diet program," and "the diet."

25  Although several hundred opportunities existed to use the trademarked name in the

26  254-page manuscript, appearance of the mark word only in the title and disclaimer

27  seem to qualify as the minimal use contemplated by the Ninth Circuit Court.

28      59. Additional presentations of the book title on internal pages also present

1  no prohibition to a finding of Nominative Fair Use.

2      60. Appearance of trademarks in headlines and banners is nominative use

3  excepted from the law of trademark infringement. *Playboy Enterprises, Inc. v.*

4  *Terri Welles, Inc.*, 279 F.3d 796, 803 (2002)

5      61. Mr. Salois' book uses a somewhat standard publishing page layout,

6  displaying the title atop alternating pages in micro-size (8 point) type, three full

7  sizes smaller than the lettering used for the book's informational text (Exhibit 23).

8  The font style and stature of the internal title make it nearly invisible to the reader.

9  The page-top title's diminutive status make that appearance minutia rather than a

10  new usage.  Its location and size make it a banner/headline—precisely what the

11  court ruled as fair use in *Playboy v. Welles*.

12      62. (Third Element) Not only has Mr. Salois done nothing to suggest

13  sponsorship or endorsement by the mark holder, he has taken numerous steps to

14  announce the lack of affiliation with Defendant Diet Company.

15      63. Such declaration not only ensures there is no confusion for trademark

16  purposes, with regard to Mr. Salois' book, it also establishes credibility in

17  evaluating Defendant Diet Company's program and products.  A review would

18  have far less value to readers if it were "tainted" from commissioning by

19  Defendant Diet Company.  That is why the words "Unauthorized Evaluation"

20  always have been a part of the title and book cover.  That also is why the

21  disclaimer inside (Exhibit 10) notes prominently that "THE AUTHOR HAD NO

22  ASSOCIATION WITH THE DIET COMPANY" and "the diet company provided

23  no sponsorship of the book and had no knowledge of it during the author's

24  participation" in the diet program.

25      64. The book's cover uses big, bold, bright lettering to textually scream

26  the review is "UNAUTHORIZED" by Defendant Diet Company.  The cover

27  also distinctly states the book is "A TRUTHFUL review of the six-meals-per-day

28  weight-loss program."  This additional proclamation thoroughly extinguishes any

1   remaining potential for doubt about the lack of connection between the book and

2   Defendant Diet Company.

3       65. It would be fraudulent representation if a book by Defendant Diet

4   Company were to include "UNAUTHORIZED EVALUATION" in the title and

5   describe the work as a "TRUTHFUL review." The public knows such statements

6   may appear only with commentary by an unaffiliated entity. So, virtually no one

7   would assume such a book was originated by Defendant Diet Company.

8       66. These several components seem to satisfy easily the Ninth Circuit

9   Court's requirement to "do nothing" to suggest endorsement by the trademark

10   holder. In fact, they go well beyond mere inaction to ensure there is no potential

11   for confusion in the matter.

12       67. In *Playboy (PEI) v. Welles,* the court found a disclaimer to be more than

13   necessary for determining Nominative Fair Use.

14           68. In addition to doing nothing in conjunction with her use of

15           the marks to suggest sponsorship or endorsement by PEI, Welles
   affirmatively disavows any sponsorship or endorsement. Her site

16           contains a clear statement disclaiming any connection to PEI.

17   *Playboy v. Welles,* at 803

18       69. While the court insisted there was no requirement for a disclaimer to

19   find Nominative Fair Use, having one was significant in reaching that conclusion.

20   *Id.* at 807 n.26

21       70. It is important also to consider that Playboy once sponsored Welles and,

22   therefore, much more potential for confusion existed. If a disclaimer so easily

23   ensured no mistake about current affiliation among those parties, a disclaimer

24   would seem certain to accomplish the same for parties that never enjoyed a

25   sponsorial relationship.

26       71. <u>Even if the book's use of the name creates confusion, some level is</u>

27   <u>permitted and compatible with a finding of Nominative Fair Use.</u>

28       72. Since the burden of proving likelihood of confusion rests with

> the (mark holder), and the (unauthorized user) has no free-standing need to show confusion unlikely, it follows ... that some possibility of consumer confusion must be compatible with fair use...

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 125 S. Ct. 542, 550 (2004)

73. "Thus, consumer confusion and fair use are not mutually exclusive. The latter will in essence rebut or excuse the former so that the use is permissible." *Century 21 Real Estate v. Lendingtree, Inc.*, 425 F.3d 211 (3rd Cir. 2005)

74. <u>Although an unauthorized user may be in hot pursuit of the same customers as the mark holder, direct competition is no prohibition to a finding of Nominative Fair Use.</u>

75. Plaintiffs in *New Kids on the Block* argued that a Nominative Fair Use defense was inapplicable where the use in question competed directly with that of the trademark holder. The court disagreed.

> 76. While the New Kids have a limited property right in their name, that right does not entitle them to control their fans' use of their own money. Where, as here, the use does not imply sponsorship or endorsement, the fact that it is carried on for profit and in competition with the trademark holder's business is beside the point.

*New Kids* at 309.

77. "(T)rademark laws do not give the New Kids the right to channel their fans' enthusiasm (and dollars) only into items licensed or authorized by them." *Id.*

78. Mr. Salois' book offers honest, detailed and insightful information gained by personal experience with Defendant Diet Company's weight-loss program. This approach is likely to be favored by readers looking for an unbiased account of the program rather than a book provided by the seller of the diet plan. Thus, Mr. Salois' book is in direct competition with Defendant Diet Company's book.

79. Although Defendant Diet Company obviously would prefer to be the only source of information about its weight-loss program, the law favors a market teeming with rivals.

80. Mr. Salois' book reviewing and evaluating Defendant Diet Company's weight-loss program is news reporting eligible for additional free-speech and free-press protections under the U.S. Constitution's First Amendment.

81. First Amendment considerations make unauthorized use of a trademark name permissible even when it conflicts with routine and expected protections under the Lanham Act.

82. "Because overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict." *Rogers v. Grimaldi*, 875 F2d 994 (2nd Cir. 1989)

83. The Second Circuit Court held the trademarked name "Ginger Rogers" could be used lawfully in the title of a film even though the work was not primarily about Ms. Rogers.  Mr. Salois used Defendant Diet Company's trademarked name in the title of his book specifically about Defendant Diet Company's weight-loss program.

84. If the law requires only a tenuous connection between the mark and the theme for First Amendment protection, a direct correlation between the two for critical commentary should qualify quite easily for the same constitutional protection.

85. If federal law constructs a solid exclusion from a dilution claim for news reporting and news commentary—as it does in 15 U.S.C. S1125(c)(3)(B)—the same reporting and commentary also should enjoy First Amendment protection.

86. Neither statute nor appellate court has forged a narrow definition of news reporting.  Some federal courts, however, have opined and ruled according to criteria based on content of the reporting and opinions from legal scholars and other commentators.

87. In *BidZirk, LLC v. Smith* 2007 WL 3119445 (D.S.C. Oct. 22, 2007), the court proclaimed a blogger was acting as a journalist when he published information about a company with which he had personal experience.

88. Upon review of the content of the article, the court finds that Smith's use of the BidZirk mark in the article was in the context of news reporting or news commentary. The article posted by Smith concerning (BidZirk) is written for the purpose of conveying information to the public. In the four installments of the article, Smith describes his experience with BidZirk in great detail. In addition, Smith addresses the positive and negative aspects, in his opinion, of dealing with... BidZirk.

*Id.* at 12

89. "Smith felt that what he learned from his experience with BidZirk would be helpful to others..." *Id.*

90. Smith plainly states at the beginning of the article as follows: "In this special report . . . I'll be telling my detailed story of using such a company and relate how my selling Apple parts on eBay for 9 years has given me unique insight into this matter."

*Id.*

91. The similarities among Smith in BidZirk and Mr. Salois are astounding. Mr. Salois' book is a detailed report on Defendant Diet Company's weight-loss program. The report is based on his personal experience with the diet and it provides the author's opinions, positive and negative, about the product's effectiveness. The report also alerts readers to obstacles and provides tips for conquering them to achieve success on the diet.

92. If a four-part blog post is news reporting that qualifies for First Amendment protection, regardless of any trademark concerns, a more than 55,000-word (254-page) in-depth analysis of Defendant Diet Company's weight-loss program surely must also.

93. Mr. Salois' honest evaluation of the diet plan provides a public service available to millions of people who struggle with obesity and other weight-related health issues. Mr. Salois' book is public-benefit news commentary deserving of First Amendment safeguards.

94. Mr. Salois is an author and publisher; he is sole proprietor of Elbow Key

Media, a business registered in San Diego County. Elbow Key Media published the book at the center of this complaint. The book benefits the public by providing honest commentary and criticism on Defendant Diet Company's weight-loss program and, therefore, is First Amendment protected news reporting.

95. Including another's trademarked name in the title of a book offered for commercial gain is no bar to First Amendment protections.

96. Titles, like the works they identify, are a combination of artistic expression and commercial promotion. The title of a work may be both an integral element of the originator's expression as well as a significant means of marketing the work to the public.

*Rogers v. Grimaldi* at 994

97. The artistic and commercial elements of titles are inextricably intertwined. (A)uthors frequently rely on word-play, ambiguity, irony, and allusion in titling their works. *Id.*

98. Consumers... have an interest in not being misled and they also have an interest in enjoying the results of the author's freedom of expression. For all these reasons, the expressive element of titles requires more (First Amendment) protection than the labeling of ordinary commercial products.

*Id.* at 995

99. The First Amendment may offer little protection for a competitor who labels its commercial good with a confusingly similar mark, but **"[t]rademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view."**

*Mattel, Inc. MCA Records*, 296 F.3d 894, 900 (9th Cir. 2002), citing *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 29 (1st Cir. 1987).

100. "Were we to ignore the expressive value that some marks assume, trademark rights would grow to encroach upon the zone protected by the First Amendment. *Mattel* at 900

101. In conclusion, Mr. Salois was compelled to use the trademarked name

in association with his review of Defendant Diet Company's weight-loss program; the name was used only in the book's title and disclaimer for proper identification and substantial steps were taken to ensure no sponsorship by the mark holder could be assumed from the usage. Appearance of the trademark name on a book reviewing its related program and products is precisely the type permitted as Nominative Fair Use. Since the book is commentary and criticism that benefit the public, any remaining potential for a snippet of doubt should be eliminated by First Amendment free press and free speech considerations.

### Claim II

### Unfair Competition

102. **The court should rule Defendant Diet Company's actions are prohibited unfair competition because they go well beyond the scope of rights intended for trademark holders to police the market, rising to the level of "exceptional" trademark bullying designed to oust its only true competitor in this category.**

103. The law recognizes the unacceptability of competitor-crippling attacks in the name of Lanham Act policing by breaking from the norm in "exceptional" cases and awarding attorneys' fees to the offended party. 15 U.S.C. § 1117(a)

104. Both the Lanham Act and state law prohibit competition and trade practices that are unjust.

> 105. (A)n "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 134 S. Ct. 1749 (2014)

106. (U)nfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice... Cal. Bus. & Prof. Code § 17200

> 107. Congress had two classes of litigants in mind when it enacted

Complaint                                                                              18

the fee provision of section 35 (of the Lanham Act). First, the legislature envisioned "make whole" compensation for certain victims of infringement; second, Congress endeavored to afford protection to (mark users) "against unfounded suits brought by trademark owners for harassment and the like."

*Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest.*, 771 F.2d 521, 524 (D.C. Cir. 1985), citing S.REP. NO. 1400, 93d Cong., 2d Sess. 5, 6 (1974), U.S.Code Cong. & Admin.News 1974, pp. 7132, 7136.

108. (D)istrict courts analyzing a request for fees under the Lanham Act should examine the "totality of the circumstances" to determine if the case was exceptional ... exercising equitable discretion in light of the nonexclusive factors identified in Octane Fitness and Fogerty (*v. Fantasy, Inc.*, 510 U.S. 517 (1994)), and using a preponderance of the evidence standard.

*SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016)

109. Factors include "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."

*Fogerty* at 575 n.19, quoting *Lieb v. Topstone Industries, Inc.*, 788 F. 2d 151, 156 (3rd Cir. 1986)

110. <u>Defendant Diet Company's selective policing of the market indicates a motivation outside of legitimate removal of infringing uses by others.</u>

111. Under the guise of Lanham Act-backed policing, Defendant Diet Company has attacked Mr. Salois' review book while ignoring other unauthorized appearances of its mark that are likely to be actual infringement.

112. A review book by Shawn Rashid (Exhibit 19) has been on the market for more than two years, garnering no attention from Defendant Diet Company, even though the Rashid book also uses the mark name large and bold on the cover and appears to mimic the mark's signature slanted letter "f." Another unauthorized user offers a book with the title, "MEDIFAST DIET" in all capital letters (Exhibit

20), the same as Defendant Diet Company has registered with the PTO (Exhibit 17). The daily fill-in diet journal has escaped scrutiny since August of 2016.

113. A simple search of Amazon.com (where Mr. Salois' book is located) with the word "Medifast" returns results that include these apparently infringing uses. Even if Defendant Diet Company never does a routine search of the market, these unauthorized uses have been unavoidable. If Defendant Diet Company searched to find Mr. Salois' book, as it must have done to learn it was back on the market (as admitted to in Exhibit 11), Amazon.com includes the other uses in the search results.

114. Even if Defendant Diet Company saved the web address and went directly to the website's page with Mr. Salois' book, Amazon.com still includes those other "infringing" publications as "suggested" additional purchases or in a feature spot that says, "People interested in this book, also looked at…" and those other publication covers are displayed with links.

115. Defendant Diet Company's monitoring of Mr. Salois' book availability made exposure to other uses impossible to miss. Defendant Diet Company has seen those infringing uses and chosen to do nothing. A mark holder interested in normal policing would have addressed those other uses. Spending the last year only attacking Mr. Salois' book indicates a motivation for reasons other than mere protection of a mark name.

116. <u>Defendant Diet Company used the Digital Millennium Copyright Act to suppress a competitor where no copyright issue is alleged.</u>

117. Defendant Diet Company made undisclosed claims to internet bookseller Amazon.com to have Mr. Salois' book removed from the market, leaving its own book to be the only one offering bone-fide info about its weight-loss program. The DMCA empowers originators of creative expression to take action against copiers of their protected material. There is no copyright dispute involving Mr. Salois' book. Defendant Diet Company improperly used the DMCA

1    to control the market for its own benefit.

2        118. Defendant Diet Company used extraordinary policing measures to

3    escape scrutiny of the court and deprive Mr. Salois' of due process.

4        119. Defendant Diet Company's use of the DMCA triggered automatic

5    responses from a retailer that allowed no redress by the "accused" (Exhibit 5).

6    Exercising options provided by the Lanham Act where a mark's use is disputed

7    would have allowed Mr. Salois to show appearance of the mark is Nominative Fair

8    Use.

9        120. Automatic ejection of Mr. Salois' book also permitted Defendant Diet

10   Company to take control of the market without fair and reasonable assessment

11   of the situation by the appropriate court.  Self-serving, questionable and stifling

12   actions employed by Defendant Diet Company are beyond those intended by the

13   Lanham Act.

14       121. Defendant Diet Company significantly hampered availability of this

15   competitor's product for more than a year and counting.

16       122. Even after Mr. Salois demonstrated in repeated communications that

17   appearance of the mark is Nominative Fair Use, Defendant Diet Company has let

18   stand its claim under the DMCA, which continues to keep Mr. Salois' book from

19   being offered through the Amazon.com/createspace sales channel.  The prohibition

20   continues.

21       123. Mr. Salois' analysis was provided to Defendant Diet Company's in-

22   house and retained intellectual-property attorneys who well know the validity of

23   his assessment of permissibility of the mark's use.

24       124. Defendant Diet Company wants no other publication to use its mark

25   prominently because it has diminished display of the mark on its own book.

26       125. Defendant Diet Company has objected to attention-getting use of its

27   name on Mr. Salois' book cover.  Case law shows such prominence has no adverse

28   effect on finding appearance of the mark in that manner is permitted.

126. Defendant Diet Company altered its competing book, changing from large and bold use of the diet name on its cover (Exhibit 16) to a cover with the name's display at a much smaller size (Exhibit 18). The attack on Mr. Salois' book is more likely attributable to Defendant Diet Company's desire to have no competitor with more noticeable appearance of the program's name.

127. <u>Defendant Diet Company continues to ignore infringing uses of its mark on publications that don't compete head-to-head with its own book.</u>

128. Defendant Diet Company has chosen to attack only one use of its mark name on a publication. It has refused to act against publications that are not in direct competition with its own book. One infringing publication (Exhibit 20) is a collection of nearly blank pages for dieters to list the foods they've eaten. Another publication (Exhibit 19) professes to review the diet but has received such bad reviews of its own that it poses no threat to Defendant Diet Company's book. Only Mr. Salois' book has been attacked by Defendant Diet Company.

129. In conclusion, Defendant Diet Company's tactical maneuvering to expel Mr. Salois' book from the marketplace is exceptionally unreasonable sabotage that amounts to legally prohibited unfair competition.

## Claim III

## Intentional Interference with a Contractual Relationship

**130. The court should find Defendant Diet Company intentionally interfered with a contractual relationship between Mr. Salois and third party Printer/Retailer Amazon.com because a representative from Medifast made undisclosed claims to the online reseller, causing it to terminate its agreement to offer Mr. Salois' book for sale on the internet.**

**131. The court also should find Defendant Diet Company intentionally interfered with a contractual relationship between Mr. Salois and marketing agent Michael Sedge when its representative inappropriately threatened legal**

**action and extinguished availability of the book Mr. Sedge was engaged to**
**promote.**

> 132. A claim for the tort of intentional interference with contractual relations must allege: (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.

*Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004).

133. **Worldwide Book Store Amazon.com**:

134. Terms of the relationship of Mr. Salois and the internet bookseller are outlined in Exhibit 25. This service agreement governs the rights and responsibilities of the parties and qualifies as a valid contract. Defendant Diet Company's knowledge of the contractual relationship is evidenced by references in its letters to Mr. Salois (Exhibits 2 and 11) and direct contact with Amazon.com by Medifast representative Jean Keltner as shown in Exhibit 5.

135. Defendant Diet Company's contact with the online merchant was for the sole purpose of obstructing availability of Mr. Salois' book to the buying public, as promised on page two of Exhibit 2. Defendant Diet Company's undisclosed claims under the Digital Millennium Copyright Act resulted in immediate removal of Mr. Salois' book from the on-demand print sales channel of Amazon.com, as evidenced by Exhibit 5. The book's continued absence from that worldwide market connection has prohibited even one sale. Defendant Diet Company's claims also have damaged Mr. Salois' standing with the online retailer, resulting in unjustified suspicion and loss of trust for Mr. Salois' future projects.

136. Defendant Diet Company's actions against Mr. Salois were unlawful intentional interference with his contractual relationship with Amazon.com that resulted in loss of revenue and damage to the author/publisher's good will and reputation.

137. **Marketing Expert Michael Sedge:**

138. Terms governing the agreement between Mr. Salois and Mr. Sedge are detailed in Exhibit 21, a valid contract of the parties. Defendant Diet Company knew of the contractual relationship based on Mr. Sedge's communications with Medifast's vice president of marketing, Brian Kagen, to discuss Mr. Salois' book.

139. Defendant Diet Company's threats of legal action against Mr. Salois and undisclosed claims to bookseller Amazon.com were intentional and for the express purpose of blocking availability of Mr. Salois' book from the market, as promised on page two of Exhibit 2.

140. Defendant Diet Company knew or should have known that ending availability of the book would destroy the need for a marketing agent and would result in the dissolution of the agreement of the parties.

141. Defendant Diet Company's threats and actions caused Mr. Sedge to cease performance of the contract as noted in Exhibit 22. Termination of Mr. Sedge's services has resulted in no promotion of the book for more than a year of the ongoing controversy. Untold sales of Mr. Salois' diet success story have been missed in a multibillion-dollar industry where dieters battle an insatiable hunger for tips to conquer obesity by achieving significant weight loss. Defendant Diet Company's attack also resulted in Mr. Sedge's loss of confidence in Mr. Salois as an author and publisher of lawfully used material for product reviews.

142. Defendant Diet Company's deliberate actions were unlawful intentional interference with Mr. Salois' contractual relationship with his marketing agent that resulted in loss of income and damage to good will and reputation.

## <u>Claim IV</u>

### <u>Intentional Interference with a Prospective Economic Advantage</u>

143. **If the court finds a deficiency in Mr. Salois' contracts with Amazon. com and marketing agent Michael Sedge, it should find Defendant Diet**

**Company's actions were intentional interference with a prospective economic advantage.**

> 144. (A) claim for the tort of intentional interference with prospective economic advantage must allege: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153-54 (2003)

145. Plaintiff also must show defendant not only knowingly interfered with the plaintiff's expectancy but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself. *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995)

146. Elements (1) through (5) are the same as noted and argued above concerning Mr. Salois' contractual relationships with Amazon.com and marketing agent Michael Sedge.

147. The additional requirement expressed by the court in *Penna v. Toyota* is satisfied by Defendant Diet Company's wrongful application of the Digital Millennium Copyright Act to eliminate a competitor and deny him due process where a tenuous trademark issue was alleged.

148. Attacking a review of its weight loss program where appearance of its mark name was clearly Nominative Fair Use is legally prohibited trademark bullying (unfair competition) that also meets the *Penna v. Toyota* requirement.

149. Defendant Diet Company's actions satisfy the elements of intentional interference with a prospective economic advantage.

### Relief-Requested

150. (Declaratory Judgment) Mr. Salois respectfully requests the court

declare Defendant Diet Company's trademarked name on the review book "Medifast & Me & You: Unauthorized Evaluation" is Nominative Fair Use and specifically permitted by law.

151. (Compensatory/Treble Damages) Mr. Salois respectfully requests the court order Defendant Diet Company to pay costs and lost profits or unjust enrichment of an amount to be determined through discovery and trial.

> 152. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum ... shall constitute compensation and not a penalty.

15 U.S.C. § 1117(a)

153. (Compensatory Damages) Mr. Salois respectfully requests the court order Defendant Diet Company to pay an amount appropriate to compensate for Mr. Salois' aggravation and distress and damage to his brand, good will and reputation as an author and publisher.

154. As a general rule, damages that are remote and speculative in nature are impermissible. *Agricultural Services Ass'n v. Ferry-Morse Seed Co.*, 551 F.2d 1057, 1072 (6th Cir. 1977)

155. "This rule serves to preclude recovery, however, only where the fact of damage is uncertain, i.e., where the damage claimed is not the certain result of the wrong, not where the amount of damage alone is uncertain. *Coverdell v. MidSouth Farm Equip. Ass'n*, 335 F.2d 9, 14 (6th Cir. 1964)

156. "It (is) not necessary for the plaintiff to prove the amount of the damages to a mathematical certainty." *Id.*

157. (Exemplary Damages) Mr. Salois respectfully requests the court order Defendant Diet Company to pay exemplary damages in an amount the court or jury deems sufficient to deter Defendant Diet Company and others from future deliberate and anti-competitive misuse of policing authority provided by the

Lanham Act.

> 158. Civil Code section 3294, subdivision (c)(1) expressly provides that the "malice" required for the imposition of punitive damages includes "... conduct which is carried on by the defendant with a conscious disregard of the rights ... of others."

*Ramona Manor Convalescent Hosp. v. Care Enterprises*, 177 Cal.App.3d 1120,  1141  (Cal. Ct. App. 1986)

159. (Injunctive Relief) Mr. Salois respectfully requests the court order Defendant Diet Company to communicate with book distributor Amazon.com that author/publisher Mr. Salois is permitted by law to use the name Medifast in his book and its promotion, advertising sales, etc.  Mr. Salois requests that the wording of the communication be approved and sufficient to repair the relationship severed with the online retailer and restore the banned sales channel known as createspace.

### **Demand for Jury Trial**

160. Plaintiff hereby respectfully requests a jury trial on all issues raised in this complaint.


End of complaint.


Date: Sept. 7, 2017


*Ted Salois*
_____

Respectfully Submitted

By: Ted Salois

Plaintiff in Pro Per

### Evidence Record

### Table of Contents

1.   First edition of Mr. Salois' review book............................................. 29

2.   Letter to Mr. Salois from Medifast in-house counsel Emarie Payne. 30

3.   Second edition of Mr. Salois' review book....................................... 32

4.   Mr. Salois' letter to Medifast counselor Payne................................ 33

5.   Notice from Amazon.com on termination of book offering.............. 34

6.   Letter from attorney at Norton Rose Fulbright in Minnesota........... 35

7.   Mr. Salois' letter to Norton Rose Fulbright...................................... 37

8.   Alternatively titled review book by Mr. Salois................................. 38

9.   Current (third) edition of Mr. Salois' review book........................... 39

10.   Disclaimer page in Mr. Salois' review book...................................... 40

11.   Letter from Norton Rose Fulbright....................................................... 41

12.   Mr. Salois' letter to Norton Rose Fulbright....................................... 42

13.   Screen shot of Mr. Salois' website...................................................... 43

14.   Screen shot of "confusion" opinion poll............................................ 44

15.   News release about controversy.......................................................... 45

16.   Defendant's competing weight-loss book........................................... 50

17.   Defendant's registration with Patent Trademark Office..................... 51

18.   Defendant's competing weight-loss book with updated cover........... 52

19.   Medifast mark user Shawn Rashid's review book.............................. 53

20.   Medifast mark user Mega Media Depot's meal journal...................... 54

21.   Mr. Salois' contract with marketing agent Michael Sedge................ 55

22.   Marketing contract termination confirmation...................................... 56

23.   Sample page for book title & text font comparison............................ 57

24.   Search results for Medifast on Amazon.com...................................... 58

25.   Mr. Salois' contract with Amazon.com (createspace)........................ 59

**<u>Evidence Record</u>**



Exhibit 1

Complaint                                                    29

## Evidence Record



**Medifast.**
Proven, Healthy Weight Loss

December 21, 2015                                    Via Certified Mail

Ted Salois
4285 Maple Avenue
La Mesa, CA 91941

Re: Trademark Infringement of the use of the Medifast registered name

Dear Mr. Salois:

This letter is in regard to your book titled Medifast Me & You

This work uses several of our trademarks without Medifast's permission.

While we are happy that you found such great success using our Medifast 5 &1® plan through one of the California Medifast Weight Control Centers®, our protected trademarks are of tremendous importance and value to the Company.

Jason Enterprises, Inc. has continuously and extensively used and advertised its trademarks, making the Medifast®, Inc. mark, and all trademarks and wording famous in the United States. As such, Medifast, Inc. and its associated trademarks are valuable assets of the company, and we will take all legal steps to protect our marks.

Unauthorized use of our trademarks is a violation of our rights under 15 U.S.C. §§ 1114 and 1125. Please be advised that we will pursue our rights to the fullest extent provided under the law.

We do not have a problem with you referencing your own success on the program inside the book by adding the proper registered mark ® adjacent to Medifast®. However, we ask that immediately remove Medifast® from the title of your book Medifast & Me & You.

Please provide us with written confirmation that all such use of the Medifast name has occurred as stated above, within 15 business days of the date this letter is received by Certified Mail. If we do not receive this confirmation

Exhibit 2 page1

## Evidence Record

within the above-referenced time frame, we will notify Amazon of this trademark infringement and demand they remove your book from their site.

If you have any questions, please feel free to contact me.

Sincerely,

Emanie Payne
Associate Counsel
Medifast, Inc.
443-379-5203

ACKNOWLEDGED AND AGREED:

TED SALOIS:

By: _____

Name: _____

Title: _____

Date: _____

Cc: Brian Kagen

**Medifast.**

Proven, Healthy Weight Loss

Exhibit 2 page2

Complaint

31

**Evidence Record**



Exhibit 3

Complaint                                        32

## Evidence Record

Emarie Payne
Associate Counsel
Medifast, Inc..
11445 Cronhill Drive. Owings Mills, MD 21117


Enclosure (1) Listing of book with correct title at Amazon.com
      (2) Disclaimer page affirmatively disavowing Medifast sponsorship of book


January 7, 2016


Counselor,

Thank you for your recent correspondence.  A holder of several trademarks, I understand your concerns.  U.S. trademark law's Nominative Fair Use doctrine, however, specifically allows use of another's mark—without permission—in precisely the way my book has used the word Medifast.  Please see Playboy Enterprises, Inc. v. Welles, 279 F.3d 796 (9th Cir. 2002).

**While the law clearly requires no changes to my book, I will be making most of the alterations you have requested.**

I have acted in good faith from initial concept through publication and sale of the book.  This is evidenced by my express and continued recommendation of the Medifast diet program and its related products.

One item you mentioned merits a detailed examination.

The full title of the book is **Medifast & Me & You: Unauthorized Evaluation** (see enclosure 1).  The entire book is an appraisal of the diet program and the food products consumed in the process.  Removing the word Medifast from the title would eliminate its ability to alert potential readers to the book's content.  Fortunately, inclusion of the words "Unauthorized Evaluation" is an absolute indication that Medifast provided no sponsorship of the project.  Beyond that, there is a clear disclaimer in the first pages of the book (see enclosure 2).  Thus, there is no need to modify the book's title.

Feel free to contact me again if you have any further comments or questions.

Sincerely,


Ted Salois


Cc: Brian Kagen

Exhibit 4

## Evidence Record

CreateSpace - Notice of Copyright Concerns Received:5700950 - Te...       https://outlook.live.com/owa/?viewmodel=ReadMessageItem

## CreateSpace - Notice of Copyright Concerns Received:5700950

"DMCA: Copyright" <copyright@createspace.com>

Tue 3/1/2016 7:39 PM

Inbox

To:tedsalois@hotmail.com <tedsalois@hotmail.com>;

Dear Ted Salois,

We have received notice from a third party regarding trademark concerns over the term "
Medifast" for " Medifast & Me & You" , Title ID:5700950 . Please be advised that we do not involve ourselves in third party disputes and therefore have removed the availability of the title through our systems until this matter is resolved.

Here you will find information on the party that submitted the notice:

Jean Keltner
jkeltner@choosemedifast.com

Please also be aware that we will be supplying your contact information to the party that filed this notice.

Once a resolution has been reached between both parties concerning the title, please contact us via copyright@createspace.com so that we may take the appropriate action regarding the title.

Regards,
Deb M.
Content Validation Request Team

Exhibit 5

34

# Evidence Record

**NORTON ROSE FULBRIGHT**

March 11, 2016

**VIA OVERNIGHT COURIER**

Norton Rose Fulbright US LLP
RBC Plaza
60 South Sixth Street, Suite 3100
Minneapolis, Minnesota 55402
United States

Ted Salois
4285 Maple Avenue
La Mesa, CA 91941

**Timothy M. Kenny**
**Head of IP Brands, United States**
Direct line +1 612 321 2805
tim.kenny@nortonrosefulbright.com

Tel +1 612 321 2800
Fax +1 612 321 2288
nortonrosefulbright.com

Re:   Unauthorized use of the trademark "MEDIFAST" in association with the book "Medifast & Me & You" by Ted Salois

Dear Mr. Salois:

We are counsel for Jason Enterprises Inc. (JEI), owner of various trademarks, including the trademark "MEDIFAST". While we have considered your correspondence of January 7, 2015, we are unfortunately unable to agree with your assertion that your use falls within any exception to trademark infringement. The *Playboy* case that you cite is easily distinguishable from your situation. In *Playboy*, the defendant had a real previous relationship with the Plaintiff. Conversely, JEI and its subsidiaries has never had any relationship with you. Hence your use of the JEI's trademark does not fall within the exception set out in the *Playboy* decision.

Furthermore, given that JEI's trademark "Medifast" is the first word in the title, is in a very large font, and figures prominently on the book cover, the disclaimer has little effect, if any. The word "Medifast" dominates to such an extent that it confusingly suggests that the book is actually *authorized* by JEI notwithstanding the much smaller notification that the book is "unauthorized". In addition, the identification of the Medifast trademark as registered by placement of an "R" in a circle creates the impression that your book is in fact a Medifast branded publication, and that you are indeed making trademark use of the word to trade on Medifast's goodwill.

While we continue to be very pleased that you have had success with our products, and that you continue to promote them, JEI must protect its goodwill. This protection requires that you must cease all potentially confusing or misleading uses of the word "Medifast" immediately.

Exhibit 6 page 1

## Evidence Record

Ted Salois
March 11, 2016
Page 2

NORTON ROSE FULBRIGHT

Our client considers this to be a serious and important matter. If you do not immediately stop your use of JEI trademarks, we shall assume that you do not wish to resolve this matter amicably, and we will advise our client accordingly, including with respect to further legal recourse and remedies that are available to trademark owners under federal and state law.

Very truly yours,

Timothy M. Kenny

TMK/bd

Exhibit 6 page 2

Complaint                                    36

# Evidence Record

Timothy M. Kenny
Norton Rose Fulbright US LLP
RBC Plaza
60 South Sixth Street
Suite 3100
Minneapolis, MN 55402

March 26, 2016

Re: Your letter regarding the book "Medifast & Me & You: Unauthorized Evaluation"

Dear Mr. Kenny,

That title is no longer on the market.

Sincerely,

Ted Salois

Exhibit 7

<u>**Evidence Record**</u>



Exhibit 8

Complaint                                                    38

**Evidence Record**



Exhibit 9

Complaint

39

<u>**Evidence Record**</u>

Medifast & Me & You: Unauthorized Evaluation

## Warning:

Be sure to get clearance from your medical doctor
before beginning any diet program.

## Disclaimers

This manuscript chronicles the author's participation in the prepackaged-food diet program known as Medifast, which is a trademark of Jason Enterprises, Inc.

Throughout the entire process of writing, publishing and distributing this book, THE AUTHOR HAD NO ASSOCIATION WITH THE DIET PLAN COMPANY or anyone connected to it other than his routine participation in its weight-loss program. He was merely a paying customer, exactly the same as anyone else who engages that organization seeking help to trim unwanted body fat. The diet company provided no sponsorship of the book project and had no knowledge of it during the duration of the author's participation.

Also, to clarify for anyone paying very close attention to the numbers recorded in the pages ahead: the author's initial weigh-in at the program office registered at 210 pounds. His scale at home showed him at 207. Throughout the program, this difference in readings remained consistent. The reason for the misalignment was not a matter of scale inaccuracy, however; it was because of the times of day when the author stepped onto the two mechanisms. His bathroom weight-check occurred regularly at about 6:30 a.m. His program office weigh-in took place a few hours later in the day. Such time variation always will produce slightly different numbers.

Lastly, the author's total weight loss actually was about 80 pounds. A visit to his doctor for non-weight-related items several months before he began the diet program registered at 219 pounds. When he completed the program, he was roughly 139 pounds. As noted above, the author was officially weighed by his program nutritionist at 210. He later tipped their scales at 142 when he transitioned off of the controlled program. Since this book focuses on the program diet traits and results, those latter numbers are considered to be the official count for the sake of this project.

Exhibit 10

Complaint                                                    40

**Evidence Record**

## NORTON ROSE FULBRIGHT

Barristers & Solicitors / Patent & Trade-mark Agents

Norton Rose Fulbright Canada LLP
Royal Bank Plaza, South Tower, Suite 3800
200 Bay Street, P.O. Box 84
Toronto, Ontario M5J 2Z4 Canada

February 9, 2017

**Sent By Registered Mail**

Ted Salois
4285 Maple Avenue
La Mesa, CA 91941

F: +1 416.216.3930
nortonrosefulbright.com

Christopher N. Hunter
+1 416.216.1906
chris.hunter@nortonrosefulbright.com

Your reference                    Our reference
55947485-TM-001

Dear Mr. Salois,

We are counsel for Jason Enterprises Inc. (JEI). Further to our correspondence of March 11, 2016, and your reply of March 28, 2016 (see attached), we were pleased that you had stopped your unauthorized use of JEI's trademark. Recently, we were surprised to learn that your book is again being sold on Amazon.com (see attached).

As set out in our earlier correspondence, our client considers this to be a serious and important matter. If you do not immediately stop your use of JEI trademarks, we shall assume that you do not wish to resolve this matter amicably, and we will advise our client accordingly, including with respect to further legal recourse and remedies that are available to trademark owners under federal and state law.

Yours very truly,

Christopher N. Hunter
Partner, Lawyer, Patent Agent, Trade-mark Agent

CNH/jpr

Enclosures

CAN_DMS: \105885042\1

Exhibit 11

Complaint                                41

# Evidence Record

Christopher N. Hunter
Norton Rose Fulbright
Royal Bank Plaza, South Tower, Suite 3800
200 Bay Street, P.O. Box 84
Toronto, Ontario M5J 2Z4 Canada

March 11, 2017

Dear Mr. Hunter,

Thank you for your recent correspondence. You are correct. My review of the Medifast diet program is back on the market. I have taken great care to configure the book to ensure there is no possibility the public could be mistaken about sponsorship or authorization by your client. The result has absolutely NO POTENTIAL FOR CONFUSION. My book's display of the trademarked name, therefore, is nominative fair use and specifically permitted by law.

Considering the lack of confusion and overall positive tone of the review, your client's continued objection to the publication makes me wonder about his motivation. I believe his persistence leaves little choice. Please inform Jason Enterprises, Inc., that I look forward to having this matter judged by an unaffiliated and unbiased body.

Sincerely,

Ted Salois

Exhibit 12

**Evidence Record**



Exhibit 13

Complaint

43

**Evidence Record**



## One Question Survey

By admin on Feb 26, 2017 in News | 0 comments

Is it OBVIOUS this book was NOT SPONSORED by the diet company named on the cover?

From the cover, do you understand this book was NOT SPONSORED by the diet company?

yes

no

f Share on Facebook

Share on Twitter

...

Powered by opinion stage

Exhibit 14

Complaint                                          44

**For Immediate Release**
March 19, 2017
Elbow Key Media
8030 La Mesa Blvd. #256
La Mesa, CA 91942

**Media inquiries for additional comments
or clarification should be sent to:**

**ted@BurnFatNotBooks.com**



# Diet giant throws weight to pound former customer

## Medifast threatens lawsuit to ban book that reviews its weight-loss program

Diet world heavyweight Medifast is pounding on a former customer to block his book that evaluates the prepackaged-food diet plan. Maryland-based Jason Enterprises, Inc., owner of the name Medifast, has unleashed its legal team on author Ted Salois to quash the tome hawked as "a truthful review of the six-meals-per-day weight-loss program."

A successful Medifast program graduate who lost almost 70 pounds in less than six months, Salois said he wrote the book to evaluate the diet and provide advice and encouragement to others who were researching or participating in the nationally known program.

"Although there are catchy slogans about just eating the food and losing the weight," Salois said, it's not exactly that simple. For



--- more ---

Exhibit 15 page 1

Diet giant threatens former customer-2-2-2-2



unknown reasons, some people do great on the diet while others flat out fail. My commentary is meant to help people avoid the difficulties and achieve their pound-shedding goals.

"Of course, it would be pretty much impossible to review the plan and share lessons learned if I were unable to identify the diet."

While it may seem at first glance that the diet company would have ultimate authority over use of its name, Salois notes the book is a review of a famous product/program and such endeavors enjoy strong support from the law.

"If you were required to obtain permission," he said, "honest commentary could never get published. An unbiased report could never be shared.



"Imagine if someone wanted to write a biography of George W. Bush, or an evaluation of the Trump presidency, would permission ever be granted without it being exchanged for tight-fisted control over the book's content? No way.

"That's the reasoning behind the law that protects my book's use of the diet's name."

See how the law precisely applies to these facts:

http://www.burnfatnotbooks.com/2017/03/the-law-in-simple-terms/

## ABOUT the AUTHOR

An avid writer, woodworker, surfer and skateboarder, Ted Salois has combined his passions to pen and publish *How To Build The World's Most Incredible Wooden Surfboard*, an instructional work with plans and lists for supplies and resources. He also wrote and illustrated *Ginger Girl, she won our hearts; we lost our minds*, a children's book about the sweet and sour life with a cantankerous but loveable "dobermutt" dog.



Like so many Americans, Salois struggled with his body shape and fitness level. The battle began nearly two decades ago when he quit smoking. His journey of weight-loss—68 pounds in less than 6 months—resulted in the book, *Medifast & Me & You: Unauthorized Evaluation*, a truthful review of the popular diet program with lessons and tips to help others.



With a more slender physique and heightened energy level, Salois retails his woodworking through a business known as Seawood Longboards, offering custom-made wooden surfboards, skateboards and

--- more ---

Diet giant threatens former customer-3-3-3-3

Salois added that it isn't enough to have the U.S. Constitution's First Amendment and trademark law's nominative fair use provisions in his corner. More is required in this fight.

"I don't have the funds to battle back just yet," he said. "But I'm working on it. I've set up a crowd-funding site—BurnFatNotBooks.com—and I'm looking for an experienced litigator who is interested in taking the case pro bono or on a reduced-fee basis.

"My opponent has plenty of money; that's for sure. But I think this is clearly trademark bullying, making it an 'exceptional' case that should allow recovery of my legal expenses."



Proceeds from sales might normally help, but availability of the book is questionable. The diet company made undisclosed claims to a major online retailer, resulting in the book's removal from those internet shelves. The author made adjustments to get it "restocked," but the diet company could repeat its interference.

As another precaution, Salois is preparing to publish an

skimboards.

He also cuts, glues and shapes lumber to create keepsakes he donates to charity under the banner, Wood Toys Rock, a self-initiated, not-for-profit endeavor.



Salois also volunteers with Voices For Children as a court-appointed special advocate for foster youth.

Additionally, he serves as a veterans' representative on his hometown's community relations and veterans commission.

Salois served in the Navy, his experiences ranging from suffering the wrath of Mt. Pinatubo's volcanic eruption in the Philippines to witnessing Shanghai students protesting in the days preceding a military crackdown in Beijing. His last tour of duty was with Pacific Fleet Imaging Command's Combat Camera Group, a rapid-deployment unit, charged with traveling to the world's hot spots to document significant events, including war.



Salois is a married father of three. The youngest children are 9-year-old twins, Momo and Jake. The eldest, Rosanna, has entered the business world but remains a short drive from the family nest in La Mesa, Calif. Wife Yuko is addicted to everything related to dogs, spending most of her free time immersed in training for obedience, agility or tracking.

--- more ---

Exhibit 15 page 3

Complaint                                    47

Diet giant threatens former customer-4-4-4-4

alternate version of the book that will deliver a fair amount of information beneficial to dieters while remaining beyond the reach of this corporation until the struggle achieves a just end.



"I already have a working title and cover design," he said. "It will reflect the frustration felt by many dieters while also giving a hat tip to the situation in which I find myself.



"I'll call it, *Burn Calories—Not This #@&%*! Diet Book.*"

Salois also said he was disappointed the company's local office and staff would be unable to benefit from his book. He said the managers and nutritionists there were extremely supportive and helpful on his journey to thin.



"They were terrific," he said. "I was sorry my completion of the program meant I would no longer get to visit them regularly. Oh, I am thrilled to be almost 70 pounds lighter. But I do miss their smiling faces and cheery attitudes."

Although the whole ordeal has been bothersome for Salois, he said he holds no grudges.

--- more ---

Exhibit 15 page 4

Complaint

48

Diet giant threatens former customer-5-5-5-5

"I have my health, a great wife, three amazingly awesome kids and I've regained the body I had as a teenager," he said. "I have so many reasons to be happy. I won't let that diet company—whatever you want to call it—cause me any grief."

The public is invited to weigh in on this situation by taking the poll at BurnFatNotBooks.com/one-question-survey.



--- end ---

Exhibit 15 page 5

Complaint                                              49

**Evidence Record**





## The Secret Is Out: Medifast, What Physicians Have Always Known About Weight Loss Paperback – 2006

by PA-C Lisa Davis Ph.D (Author)

★★★☆☆ ▾   5 customer reviews

▸ See all formats and editions

**Paperback from $10.97**

## Product details

**Paperback**
**Publisher:** Medifast, Inc.; 1st edition (2006)
**Language:** English
**ISBN-10:** 0615132197
**ISBN-13:** 978-0615132198
**Product Dimensions:** 8.9 x 6.5 x 0.8 inches
**Shipping Weight:** 1.1 pounds
**Average Customer Review:** ★★★☆☆ (5 customer reviews)
**Amazon Best Sellers Rank:** #1,446,247 in Books (See Top 100 in Books)

6 Used from $10.97
3 New from $19.99

Exhibit 16

# Evidence Record

---

TSDR   ASSIGN Status   TTAB Status   ( Use the "Back" button of the Internet Browser to return to TESS)

## ▼ MEDIFAST.

| | |
|---|---|
| **Word Mark** | MEDIFAST |
| **Goods and Services** | IC 042. US 100 101. G & S: Weight reduction, diet planning and supervision services. FIRST USE: 19880500. FIRST USE IN COMMERCE: 19880500 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 03.21.01 - Caduceus; Serpent and staff (caduceus) |
| **Serial Number** | 75546463 |
| **Filing Date** | September 2, 1998 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | August 17, 1999 |
| **Registration Number** | 2291136 |
| **Registration Date** | November 9, 1999 |
| **Owner** | (REGISTRANT) Jason Pharmaceuticals, Inc. CORPORATION MARYLAND 11445 Cronhill Drive P.O. Box 370 Owings Mills MARYLAND 211170370 |
| | (LAST LISTED OWNER) JASON ENTERPRISES, INC. CORPORATION DELAWARE 11445 CRONHILL DRIVE OWINGS MARYLAND 21117 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Timothy M. Kenny |
| **Prior Registrations** | 1291774;1541009;1647739;1737385;AND OTHERS |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE the descriptive design representation of a caduceus APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20090608. |
| **Renewal** | 1ST RENEWAL 20090608 |
| **Live/Dead Indicator** | LIVE |

TESS HOME   NEW USER   STRUCTURED   FREE FORM   BROWSE DICT   SEARCH OG   TOP   HELP   CURR LIST   FIRST DOC
PREV DOC   NEXT DOC   LAST DOC

| HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY |

Exhibit 17

**Evidence Record**



▸ See all formats and editions

Paperback
from $1.99

24 Used from $1.99
4 New from $6.90

## Product details

**Paperback:** 221 pages
**Publisher:** Medifast, Inc. (2007)
**Language:** English
**ASIN:** B0019FGLQM
**Product Dimensions:**
8.9 x 6.4 x 0.7 inches
**Shipping Weight:** 1.1 pounds
**Average Customer Review:**
(11 customer reviews) ★★★★☆
**Amazon Best Sellers Rank:**
#462,049 in Books

# The Secret is Out: What Physicians Have Always Known About Weight Loss (The Medifast Program)

by Lisa Davis (Author), Bradley T. MacDonald (Author)
★★★★☆ ▾     11 customer reviews



Exhibit 18

Complaint                                              52

## Evidence Record



Copyrighted Material

Copyright © 2015 Shawn Rashid

All rights reserved.


BULL CITY

Protected by copyright laws of the United States and international treaties. Manufactured in the United States of America. Published by Bull City Publishing, LLC (www.bullcitypublishing.com)

No part of this book may be reproduced in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the publisher, except by a reviewer, who may quote brief passages in a review.

Copyright and other intellectual property laws protect these materials and any unauthorized reproduction or retransmission will constitute an infringement of copyright law.

Federal law provides severe civil and criminal penalties for the unauthorized reproduction, distribution, or exhibition of copyrighted materials. Penalties for criminal and statutory copyright infringement are set forth in 18 U.S.C. § 2319.

### Disclaimer

The subject matter contained within is an original work. It is intended for 'informational and educational' purposes and the reader is encouraged to practice all diligence prior to the application of any subject matter in copy herein.



Exhibit 19

Complaint                                                        53

# Evidence Record



Exhibit 20

Complaint                                                                 54

## Evidence Record



**THESEDGEGROUP**

October 19, 2015

### General Letter of Agreement

This letter, signed by the Parties involved, shall layout the relationship between the Parties with regards to sales and marketing representation of the book (title) Medifast & Me & You: Unauthorized Evaluation by Ted Salois.

The Parties involved shall be Ted Salois and Michael Sedge.  They shall act as partners in all aspects of developing the marketing and sales concepts of the title, including business plan, proposals, subsidiary and other rights.  The Parties agree to maintain all information in strict confidence, except to potential marketing partners, investors or other possible individuals or parties with whom the Parties may desire to engage.

Michael Sedge shall act as agent for the title and Mr. Salois, coordinating activities with the latter.  For his efforts Mr. Sedge shall receive a seven-teen-percent (17%) commission on sales and revenues generated as a result of his efforts.

The Parties, signed below, agree to the above and, in good faith, the working relationship involved in this Letter of Agreement.

Agreed this 20th day of October, 2015.

_____         Ted Salois

_____         Michael Sedge

Exhibit 21

**Evidence Record**



Exhibit 22

## __Evidence Record__

Medifast & Me & You: Unauthorized Evaluation





The young me          The round me          The new me

picture of me taken when I was a teenager. I looked at myself gliding along on a skateboard. What intrigued me was my super lean physique. I asked myself, "Why can't I be like that today?" I could think of no reasonable answer.

I had heard all the excuses about how there is no escaping weight gain as we age. Anyone who accepts such reasoning is just rationalizing a lack of desire to commit.

The evidence is out there. Plenty of examples can be found. People whose youth has slipped away are still able to achieve great fitness. And these are not the people whose metabolism just speedily burns off their calories.

People who pay careful attention to what they eat and stay active can maintain a slim body without difficulty. I know. I have become one of them.

I hope you join this group of extremely happy people.



xvi

Exhibit 23

## Evidence Record



Exhibit 24

Complaint                                                    58

# Evidence Record

## SERVICES AGREEMENT

This non-exclusive Services Agreement (the "Agreement") contains the complete terms and conditions that apply to your use of the CreateSpace Services (the "Services"), described at https://www.createspace.com/specifications. As used in this Agreement, "we", "our" and "CreateSpace" means, individually:

1. On-Demand Publishing LLC, (a Delaware limited liability Company that does business under the name "CreateSpace"),

2. Amazon Media EU S.à r.l. (a Luxembourg company with registration number B101818 and its registered office at 5 Rue Plaetis, L-2338, Luxembourg) and/or

3. any other Amazon.com Inc. affiliate that joins as a party to this Agreement as provided in Section 16.

As used in this Agreement, "you" means the person or entity accepting this Agreement. In order to use the Services you must:

1. have registered for an account at our web site, the homepage of which is at www.createspace.com (together with any successor or replacement website, the "Site") by providing your real first and last name, valid address, valid phone number, valid e-mail address and any other required information; and

2. be able to lawfully enter into contracts.

1. Amendment; Notice of Changes.

We reserve the right to change the terms and conditions contained in this Agreement, other Service-specific terms and conditions, or any policies or guidelines governing the Services, including without limitation, any of the information posted on the Products and Help sections of the Site or the Content Guidelines, Submission Requirements, Pricing pages, Site Terms and Privacy Notice pages, at any time and in our sole discretion. Any changes to the Site, including Service-specific terms and conditions, or policies and guidelines referenced in this Agreement, will be effective upon posting of such revisions on the Site and without notice to you. We will, however, post a notice of any changes to this Agreement on the Site for at least thirty (30) days after the changes are effective. You are responsible for regularly reviewing the Site for changes and notice of any changes. Changes to referenced policies and guidelines or any other information in any Products, Help, or other web pages may be posted without any other notice to you. YOUR CONTINUED USE OF THE SITE AND THE SERVICES FOLLOWING OUR POSTING OF ANY CHANGES TO THE AGREEMENT ON THE SITE WILL CONSTITUTE YOUR ACCEPTANCE OF SUCH CHANGES OR MODIFICATIONS. IF YOU DO NOT AGREE TO ANY CHANGES TO THIS AGREEMENT OR THE SITE, DO NOT CONTINUE TO USE THE SERVICES OR THE SITE.

2. Delivery of Content

2.1 Content Requirements

Once you have registered as a member on the Site, you may set up distinct and separately saleable video, audio and/or written works (each, a "Title") by entering required information regarding such Titles on the Site, in connection with our Title Setup requirements. You may deliver to us Content for Titles at any time during the term of this Agreement. "Content" means all content you deliver to us relative to a Title, including your Titles, any short segments of content (each, a "Promotional Clip") (if any), all available text data relevant to a Title (for example, as applicable, the Title name, description, images and trim size of a written Title, and release date) ("Metadata") artwork and images for each Title (together with the Metadata, the "Descriptive Materials"), and any trademarks, trade names, service marks, logos, commercial symbols and other designations

contained in any of the foregoing.

2.2 Content Delivery

For each Title you set up, you will send the applicable Content and Descriptive Materials at your own expense and in accordance with the Submission Requirements (which we may update from time to time), via electronic upload for written Titles and in hard copy physical format for video Titles (each such instance of Content, a "Source Copy"). You will at all times retain legal title to your Source Copies. However, we will not return to you any of the hard copy physical format materials you provide to us.

2.3 Applicable Policies and Guidelines

You agree to abide by, and all Content you provide to us under this Agreement will comply with, the payment terms, procedures, policies, and guidelines contained in the Content Guidelines and in the Products, Help and Pricing pages for use of the Products, as well as any Service-specific terms and conditions on the Site. The procedures, policies, and guidelines contained in the Products and Help pages explain the processes and set out acceptable conduct and prohibited practices. We may change these procedures and guidelines in the future, and such changes will be effective immediately upon posting without notice to you. You should refer regularly to the Products and Help pages to understand the current procedures and guidelines for use of the Services and to be sure that your Titles are eligible for listing via the Services.

3. Services

3.1. General

Once you are registered on the Site, have provided us all the required information, have set up Titles and delivered Content, including any Metadata and Descriptive Materials, to us, and have paid us any applicable fees, you are eligible for our Services, which may include facilitating the distribution of your Titles (including your Content), the listing of your Titles on the CreateSpace E-Stores, Amazon Properties and other sales channels, the creation of Packaging Materials, the printing or manufacture of Units (as defined in Section 4.2 below) and the fulfillment of Unit orders, in each case on your behalf. Capitalized terms in this Agreement have the following meanings:

"Amazon Properties" means (i) the Amazon Site and any "mirrored" version of the Amazon Site which substantially replicates the Amazon Site or a portion thereof, (ii) any site with a web page widget, any site with any other web page real estate, any application for use on mobile devices, or other online point of presence, which in each case is branded or co-branded "Amazon" and allows for the discovery and purchase of products from Amazon or its affiliates, (iii) any other web site or online point of presence on any platform through which Amazon.com Inc. or its affiliates make products or services available for discovery and (iv) any other online point of presence or web site that you approve for treatment as an Amazon Property at our request, such approval not to be unreasonably withheld.

"Amazon Site" means the web site whose primary home page is identified by the URL www.amazon.com (and any successor or replacement web site), websites operated by us or our affiliates primarily targeted at customers outside the US, and any other web sites maintained by or for us or our affiliates.

"Book" is a Unit in the form of a physical book.

A "CreateSpace E-Store" is one or more e-commerce-enabled web page(s) hosted by us that is customizable by you to create an individualized web storefront for the sale of your Titles.

"Packaging Materials" are, as applicable, the disc cover inserts, printed disc face, book covers, and any other physical material that accompanies a product.

3.2. Ordering Your Own Titles. You may order copies of your own Title from us, and if you do so, we will ship the Units to the address specified by you. Title to such Units will pass to you when we place the Units with the carrier for shipment.

3.3. Ancillary Services. We offer certain ancillary Services, which are described on the Site. Some of our ancillary Services may have additional terms and conditions that apply only to those Services. Using Services that have additional terms and conditions constitutes your agreement to those terms and conditions. We reserve the right to discontinue or alter the terms of these Services at any time.

4. Titles

4.1 Content Rejection and Removal

We may, in our sole discretion, at any time, and without notice to you (a) reject Content; or (b) remove, or refuse to list or distribute any Content on or from any CreateSpace E-Store, Amazon Property or other sales channel. You remain liable for all fees and other amounts that you may owe under this Agreement in connection with any Title or Content we remove because of a violation of this Agreement or our Content Guidelines. You may withdraw your Title from the Services at any time, but we will have 30 days from the date of a Title's withdrawal (or termination of this Agreement) to remove all applicable Content. However, we may fulfill any Customer orders pending as of the date we remove such Title from the Services. If we request that you provide additional information relating to your Content, such as information confirming that you have all rights required to permit our distribution of the Content, you represent and warrant that any information and documentation you provide to us in response to such a request will be current, complete, and accurate. You authorize us, directly or through third parties, to make any inquiries we consider appropriate to verify your rights to permit our distribution of the Content and the accuracy of the information or documentation you provide to us with respect to those rights.

4.2 Pricing; Legal Title

We or our affiliate will be the seller of record for each physical product of your Title (each, a "Unit") to a customer (each, a "Customer") we or our affiliate sells through any CreateSpace E-Store, Amazon Property or other sales channel. To the extent permissible under applicable local laws, we have sole and complete discretion to set the retail price at which your Titles are sold on the Amazon Properties. You will provide a List Price for each Title in the applicable currency of each Amazon Property through which you elect to distribute your Title, which will be at or below the suggested retail price at which you list such title in physical form in that currency through any distribution method. For the purpose of this Agreement, "List Price" means the suggested retail price that you submit to us per individual Title, which we will use to calculate the retail price of the Title on each Amazon Property subject to applicable local laws. Please note that you may update the List Price for your Titles in each currency at any time in

# **Evidence Record**

accordance with the Submission Requirements, but it may take as long as 30 days for the list price on the Amazon Properties to be updated.

### 4.3 Customer Returns and Refunds

We will determine how to handle Customer returns of Units, which may include, without limitation (a) in the case of physical Units, placing the returned copy of the Unit into inventory and reselling it to another Customer, in which case we will have no obligation to pay you any Content License Royalty for the resale of such Unit (because we paid, or will pay, you for the original sale of such Unit); or (b) destroying the Unit and calculating amounts due to you net of the Content License Royalty we previously paid for the destroyed return. We reserve the right to prohibit returns under any circumstances. If a Unit is returned and we have already paid you a Content License Royalty on the returned Unit, we may offset the amount of the Content License Royalty we previously paid you for that returned Unit against future Content License Royalty, or require you to remit to us the amount of the Content License Royalty we paid to you for the returned Unit. If, after a period of time, you have not taken advantage of Services you have purchased, we may, in our sole discretion, refund your payment for those Services.

### 5. Fees; Taxes

#### 5.1 Fees

You will pay us all applicable fees, as specified in our Price List.

For any Unit sold to a Customer, we will pay you the applicable Content License Royalty based on the List Price of the Unit: (a) within 31 days after the end of the month in which the Unit sold for physical Units sold through the CreateSpace E-Stores and the Amazon Properties; and (b) within 60 days after the end of the month in which the Unit is sold for physical Units sold through Expanded Distribution. The Content License Royalty will be calculated based on the List Price of the Unit in the location where we manufacture that Unit (e.g., GBP for the UK) and payments will be made to you in that currency (the "Manufactured Currency").

All payments will be made via check, draft, direct deposit, electronic transfer or other method we designate in the Program Policies. We will make all payments in the Manufactured Currency unless you choose to receive payment in an alternative payment currency. A list of available payment currencies is provided in the Program Policies. If you change your payment currency using the options in the Program Policies, the change will be effective on the first day of the calendar month following the calendar month in which you make the change (unless we make an earlier period available). If we pay you in a currency other than the Manufactured Currency, the final amount remitted to you will be inclusive of all fees and charges for facilitating payment to you in your selected currency. Additionally, if we pay you in the Manufactured Currency, we may charge you an additional fee if you elect to receive payment by check or draft when electronic transfer is available in the country where your bank account is maintained. If we pay you by check or draft, we may accrue and withhold payments until the total amount due meets a minimum payment threshold. Please see the Program Policies for details on supported currencies and methods. If you have amounts payable hereunder upon the termination of this Agreement, then we may set off such amounts against any payment then

payable to you, or you will immediately pay any such amounts. For purposes of calculating your Content License Royalty, a sale of a Unit will be deemed to have taken place at the time that we or our affiliate manufactures a physical Unit on demand.

If you reasonably conclude based on information available to us that your actions and/or performance in connection with this Agreement may result in disputes, chargebacks or other claims, then we may, in our sole discretion, delay initiating any remittances and withhold any payments to be made or that are otherwise due to you in connection with this Agreement for the shorter of: (a) a period of 90 days following the initial date of suspension; or (b) completion of any investigation(s) regarding any of your actions and/or performance in connection with this Agreement. Additionally, if a third party asserts that you did not have all rights required to make your Content available using our Services we may hold all Content License Royalty due to you until we reasonably determine the validity of the third party claim. If we determine that you did not have all of those rights or that you have otherwise breached your representations and warranties or our Content Guidelines with regard to your Content, we will not owe you a Content License Royalty for that Content and we may offset any Content License Royalty that were previously paid against any future Content License Royalty, or require you to remit them to us. If we terminate this Agreement because you have breached your representations and warranties or our Content Guidelines, you forfeit any Content License Royalty not yet paid to you. If after we have terminated your account you open a new account without our express permission, we will not owe you any Content License Royalty through the new account. We will not be liable to you if we act in accordance with the provisions of this Section.

All statements and other accountings will be conclusive, final and binding, unless you give us written notice stating the specific basis for objection within one year after the date the payment was rendered. You will not maintain any action or proceeding against us or our affiliates in respect of any disputed statement unless you commence that action or suit against us within 6 months following the date that you provide us with the written notice referred to in the immediately preceding sentence.

### 5.2 Bad Debt

We will be entitled to an adjustment to payments made to you for any amounts ultimately not collected because of fraudulent credit card use or bad debt, in an amount equal to the payment otherwise payable to you in connection with such purchase.

### 5.3 Taxes

#### 5.3.1 Payments to You.

For the purposes of this paragraph, the term "Transaction Taxes" means sales/use, value added, or transaction taxes and other charges such as duties, customs and government imposed surcharges. You will be responsible for determining taxes you owe on payments you receive under this Agreement. To the extent payments to you are subject to any Transaction Taxes, (a) payment includes all applicable Transaction Taxes, and (b) you will supply us with a valid tax invoice separately stating such Transaction Taxes if required by law. In return, we will provide you with any applicable exemption certificate acceptable to the relevant taxing authority that we possess, in which case you will not collect the Transaction Taxes

covered by such certificate. If any other taxes (for example, international withholding taxes) are required to be withheld on any payment, we will deduct such taxes from the amount otherwise owed and pay them to the appropriate taxing authority.

#### 5.3.2 Your Payments to Us.

All fees payable by you to us pursuant to this Agreement exclude Transaction Taxes. In addition to amounts owed by you pursuant to this Agreement, you will pay us any Transaction Taxes we are required to collect on such fees. If we charge you Transaction Taxes, you may provide us with a valid exemption certificate acceptable to the relevant taxing authority, in which case we will not collect the Transaction Taxes covered by such certificate. All fees payable by you to us under this Agreement will be made without setoff and without deduction or withholding for, or on account of, any present or future tax.

### 6. Licenses; Ownership; Feedback

#### 6.1 Content

Subject to your retained control and ownership of your Content as described in Section 6.4, in order to enable us to provide you with the Services on your behalf, you grant to us a nonexclusive license, during the term of this Agreement, to (a) create digital versions of Content you provide in nondigital format; (b) create a digitized version of the Content that we will use to create a Unit (each, a "Source File"); (c) with respect to Books, print, distribute and sell your Book through the CreateSpace E-stores, the Amazon Properties and other sales channels, (d) reformat, reproduce, and distribute your Content through the CreateSpace E-Stores, the Amazon Properties, and other sales channels in digital form on physical media, (e) distribute, display, transmit, perform and use the Promotional Clips (if any) and the Descriptive Materials for promotional purposes; and (f) create Packaging Materials from the Descriptive Materials.

We may broadly integrate the Descriptive Materials into the Amazon Properties, and they may appear in several places on the Amazon Properties. By way of example and not limitation, the Descriptive Materials may appear on product detail pages, in search results, in customer browsing and buying history, and in routine, automated and community-driven merchandising features such as recommendations and "Listmania." Our use of the Descriptive Materials may become integral to the Amazon Properties throughout the term of this Agreement and will continue beyond the term of this Agreement even though we will no longer produce or sell new Units after the term of this Agreement. Therefore, notwithstanding anything to the contrary herein, for Descriptive Materials and Promotional Clips, the license you grant us in Section 6.1(e) will be perpetual and royalty-free. For preprinted inventory of your Units, we may distribute and sell your Units through the Amazon Properties and other channels until we have sold all Units that we created during the term of this Agreement.

For video and audio Titles, we may use text from the Content, including creating or using closed caption text or transcripts, as the basis for returning search results to visitors to the Amazon Site and to display excerpts of such text to illustrate

Exhibit 25 page 2

# Evidence Record

the relevance of the search result. You will deliver closed captions and subtitles in accordance with our Content Guidelines to the extent available, but in any case to the extent required by applicable law. Amazon may create, insert and distribute closed captions and subtitles for the Content.

You agree that we and our affiliates may include your written Titles in the Search Inside!™ program, which enables visitors to view, search, and "page browse" through your written Titles. Accordingly, for each of your written Titles you hereby grant us permission, on a nonexclusive, perpetual basis, to (x) reproduce and store the entirety of each Title in digital form on one or more computer facilities of or under the control of us or our affiliates or our independent contractors; (y) extract factual information from your written Titles, such as character names, statistically improbable phrases and capitalized phrases, and display such information to visitors to any Amazon Property; and (z) to display portions of each Title on the Amazon Properties so that a user will be able to (i) use queries to locate, select and display excerpts that include the search terms for every occurrence of the search terms; and (ii) view a limited number of pages within a Title during any single session.

You further grant us permission to cause such transmission, reproduction and other use of the Content as mere technological incidents to and for the limited purpose of technically enabling the rights licensed to us under this Agreement (including, but not limited to, caching to enable display and transfer and encoding supplemental copies of Titles in alternate formats). So long as we pay you the applicable Content License Royalty upon the manufacture of your Book, we may print a reasonable number of copies of any Book to hold in our inventory. We may destroy inventory at any time without obligation to you.

You grant us the rights set forth in this Section 6.1 on a worldwide basis; however, if we make available to you a procedure for indicating that you do not have worldwide distribution rights to a Title, then the territory for the sale of that Title will be those territories for which you indicate, through the procedure we provide to you, that you have distribution rights.

6.2 Ownership

Subject to the licenses set forth in this Section 6 and the following sentence, and as between the parties, you retain all right, title and interest in and to the Content, including all patent, copyright, trademark, service mark, mask work, moral right, trade secret or other intellectual property or proprietary right (collectively, "Intellectual Property Rights") therein. Subject to your underlying rights in the Content, as between the parties, we will own all right, title and interest in and to the templates and other materials created, provided or used by us in our performance under this Agreement (including Source Files and Packaging Materials), including all Intellectual Property Rights therein.

6.3 Cover Images.

We may agree to provide you a file containing an image of the cover of your Title ("Cover Image"). Contingent upon your receipt of such Cover Image, we hereby grant you, during the term of this Agreement, a worldwide, royalty-free right to use the Cover Image for any lawful purpose related to promoting your Title.

6.4 Feedback

Any feedback, ideas, modifications, suggestions, improvements and the like made by you with respect to the Services, the Site, anything on the Site (including current or future features), or any beta program we are running ("Feedback") will be our property. You agree to assign, and hereby assign, all right, title and interest worldwide in the Feedback and the related Intellectual Property Rights to us and agree to assist us, at our expense, in perfecting and enforcing such rights. We may disclose or use Feedback for any purposes whatsoever without any obligation (including any financial obligation)

to you. In addition, if you are participating in a beta program, you agree to provide us with any reports we request and to promptly respond to any and all reasonable inquiries, questionnaires, surveys and other test documents we submit to you.

7. Representations and Warranties

You acknowledge that we are not the publisher of your Titles (including your Content). You represent and warrant that you will be the publisher of your Titles (including your Content) and, in any case, that you will bear the full and ultimate responsibility for the publication and general distribution of your Titles (including your Content). You further represent and warrant that (a) you will comply with all laws, rules, regulations and orders of any governmental authority having jurisdiction over your performance hereunder as applicable in each country (including any local legal requirements with respect to your publication of your Titles, such as making any necessary notifications and filings of copies of your Titles); (b) you have all requisite right, power and authority to enter into this Agreement and perform your obligations hereunder; (c) prior to your delivery of Content to us you have or have obtained all rights, clearances and permissions to grant the licenses you grant hereunder that are necessary for us to exercise the rights you grant under this Agreement without any further payment obligation by us, including all necessary music publishing and public performance rights in the Content and the Promotional Clips; (d) you are granting us the rights, licenses and authorizations you grant hereunder free and clear of any encumbrances, and this Agreement does not violate or conflict with any other arrangements, understandings or agreements between you and any third party; (e) the Content (and our use thereof) is not defamatory, libelous, obscene, or otherwise illegal, does not invade any right of privacy, and does not infringe upon any Intellectual Property Right or right of publicity of any person or entity, and any recipe, formula, or instruction contained in the Content is accurate and is not injurious to the user; (f) the Content complies with all aspects of the Content Guidelines, as such may be updated from time to time; and (g) you are and will be solely responsible for accounting and paying any co-owners or co-administrators of any Content any royalties with respect to the uses of the Content permitted hereunder and their respective shares, if any, of any monies payable hereunder.

You will pay (x) all royalties and other income due to copyright owners, record royalty participants and under any applicable collective bargaining agreements relating to the Titles, and (y) all royalties and other income due to authors, copyright owners or administrators and/or other royalty participants in any musical compositions embodied in the Titles.

8. Indemnification; Maintenance of Rights

8.1 Indemnification

You will indemnify, defend and hold us and our affiliates (and the respective employees, directors, members, managers and representatives of each) and any operator of an Amazon Property harmless from and against any and all claims, judgments, damages and expenses (including without limitation reasonable attorneys' fees) (collectively, "Claims") arising out of any breach or alleged breach by you of the terms of this Agreement, including without limitation the terms contained within the Products and Help pages and the Content Guidelines and Privacy Notice, which are incorporated herein by reference.

8.2 Maintenance of Rights

You will not do anything to intentionally prejudice the rights granted hereunder, but in the event that you lose any rights or other licenses, consents or permissions relating to a specific Title that are necessary for you to grant the rights you grant to us hereunder, or you receive notice of a third-party claim relating to a Title which you reasonably deem to be of concern, you will immediately remove such Title from our Services. Notwithstanding the foregoing, you will use commercially reasonable efforts to maintain the rights to the Content that you provide to us under this Agreement. Without limiting our rights or remedies under this Agreement, you will reimburse us for any refunds we make to Customers as a result of the withdrawal of a Title under this Section. For the avoidance of doubt, nothing in this Section 8.2 is intended to relieve you of your indemnification obligation regarding Claims set forth in Section 8.1 above.

9. DISCLAIMER OF WARRANTIES; LIMITATION ON LIABILITY

THE SERVICES ARE PROVIDED ON AN "AS IS" BASIS. WE AND OUR AFFILIATES MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION: (A) THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NONINFRINGEMENT; (B) THAT THE SERVICES, THE SITE, OR THE AMAZON PROPERTIES WILL MEET YOUR REQUIREMENTS, WILL ALWAYS BE AVAILABLE, ACCESSIBLE, UNINTERRUPTED, TIMELY, SECURE, OR OPERATE WITHOUT ERROR; AND (C) ANY IMPLIED WARRANTY ARISING FROM COURSE OF DEALING OR USAGE OF TRADE. TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, WE AND OUR AFFILIATES DISCLAIM ANY AND ALL SUCH WARRANTIES. WE AND OUR AFFILIATES WILL NOT BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION DIRECT, INDIRECT, INCIDENTAL, PUNITIVE, AND CONSEQUENTIAL DAMAGES, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE SITE, THE AMAZON PROPERTIES, ANY OBLIGATION, LIABILITY, RIGHT, CLAIM, OR REMEDY IN TORT, WHETHER OR NOT ARISING FROM OUR NEGLIGENCE, THE SERVICES, THE INABILITY TO USE THE SERVICES, OR THOSE RESULTING FROM ANY GOODS OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH THE SERVICES.

10. Term; Termination

This Agreement will remain in effect until terminated in accordance with this Section. You may terminate this Agreement at any time by giving notice to us, and we may terminate this Agreement at any time by sending you an e-mail notice at the e-mail address associated with your account. Our notice of such termination will be effective at the time we send you

Exhibit 25 page 3

## Evidence Record

the notice. Upon termination, you will pay us whatever fees were incurred prior to the date of the termination. Also upon termination: (a) we may fulfill any Customer orders pending as of the date of termination; and (b) we may continue to maintain digital copies of your Content in order to provide "refresh" copies or otherwise support customers who have purchased or rented a Title via Amazon Instant Video prior to termination. Upon termination, we may set off against any payments to be made to you, an amount determined by us to be adequate to cover any disputes, chargebacks and refunds from your account for a prospective three-month period. At the end of such three-month period following termination, we will refund any amount not used to offset chargebacks and refunds to you, or seek reimbursement from you via any of the means authorized in Section 5.1 above for any additional amount required to offset chargebacks and refunds, as applicable. The following Sections will survive termination of this Agreement: 4.1, 4.3, 5, 6 (except subsections 6.1(a)-(d) and (f)), 8.1, 9, 10, 14, 15, and 16. In addition, all rights to Units acquired by Customers will survive termination.

11. Password Security; Account Information; No Multiple Accounts

Your password for the Site may be used only to access the Site, use the Services, electronically set up your Titles, and review any reports, records, or other features we make available to you. You are solely responsible for maintaining the security of your password. You may not disclose your password to any third party (other than third parties authorized by you to use your account) and are solely responsible for any use of or action taken under your password on the Site. If your password is compromised, you will change your password. You must ensure that all information you provide in connection with establishing your account, such as your name, address and email, is accurate when you provided it, and you must keep it up to date as long as you use the Services. You may maintain only one account at a time. If we terminate your account, you will not establish a new account. You will not use false identities or impersonate any other person or use a username or password you are not authorized to use. You authorize us, directly or through third parties, to make any inquiries we consider appropriate to verify account information you provide. You also consent to us sending you emails relating to the Program and other publishing opportunities from time to time. This takes precedence over any directions you may have given us, including through any Amazon or Amazon affiliate web site.

12. Privacy

Please read the www.createspace.com privacy notice (the "Privacy Notice"), which is incorporated herein by reference. The Privacy Notice may be changed by us in the future. You should check the Privacy Notice frequently for changes. Unless otherwise authorized or consented, you agree not to use any information regarding other participants of the Program that is accessible from the Site or the Amazon Site or Amazon affiliate web site or disclosed to you by us or our affiliates. By way of example and not limitation, you agree not to use any such information for purposes of solicitation, advertising, unsolicited e-mail or

spamming, harassment, invasion of privacy, or otherwise objectionable conduct. We and our affiliates may communicate with you in connection with your listings, sales, and the Services, electronically and in other media, and you consent to such communications regardless of any "Customer Communication Preferences" (or similar preferences or requests) you may have indicated on the Site or by any other means.

13. Relationship of Parties

You and we are independent contractors, and nothing in this Agreement will create any partnership, joint venture, agency, franchise, sales representative, or employment relationship between the parties. You will have no authority to make or accept any offers or representations on our behalf. You will not make any statement, whether on your site or otherwise, that would reasonably contradict anything in this Section or Agreement.

14. No Grant of License by Us

For the avoidance of doubt, we do not hereby grant you any license or other rights to any intellectual property or technology owned or operated by us or any of our affiliates, including, without limitation, any trademarks or trade names (collectively, the "CreateSpace IP"). Additionally, you may not in any way use any CreateSpace IP, including without limitation for the purpose of issuing any press release or other activity that may be considered promotional or marketing related.

15. Disputes; Governing Law

Any dispute or claim relating in any way to this Agreement, your visit to CreateSpace.com or our Services will be resolved by binding arbitration, rather than in court, except that you may assert claims in small claims court if your claims qualify. The United States Federal Arbitration Act and federal arbitration law apply to this Agreement. There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of this Agreement as a court would. To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to our registered agent, Corporation Service Company, 300 Deschutes Way SW, Suite 304, Tumwater, WA 98501. The arbitration will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA's Supplementary Procedures for Consumer-Related Disputes. The AAA's rules are available at www.adr.org or by calling 1-800-778-7879 (in the United States). Payment of all filing, administration and arbitrator fees will be governed by the AAA's rules. We will reimburse those fees for claims totaling less than $10,000 unless the arbitrator determines the claims are frivolous. Likewise, we will not to seek attorneys' fees and costs in arbitration unless the arbitrator determines the claims are frivolous. You may choose to have the arbitration conducted by telephone, based on written submissions, or in person in the United States county where you live or at another mutually agreed location. You and we each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action. If for any reason a claim proceeds in court rather than in arbitration

you and we each waive any right to a jury trial. You or we may bring suit in court on an individual basis only, and not in a class, consolidated or representative action, to apply for injunctive remedies. You may bring any such suit for injunctive remedies only in the courts of the State of Washington, USA. The United States Federal Arbitration Act, applicable United States federal law, and the laws of the state of Washington, USA, without regard to principles of conflict of laws, will govern this Agreement and any dispute of any sort that might arise between you and us relating to this Agreement or the Services.

16. Miscellaneous

Any Amazon affiliate may join as a party to this Agreement and will notify you if it does. The joining Amazon affiliate will be entitled to exercise the rights you grant under this Agreement. Each Amazon party is severally liable for its own obligations under this Agreement and is not jointly liable for the obligations of other Amazon parties. You consent to the use of electronic means to complete this Agreement and to provide you with any notices we give you in relation to this Agreement. To be effective, any notice given by a party under this Agreement must be in writing and (i) if by an Amazon party, delivered via email, via a posting on the CreateSpace website or via a message through your account, or (ii) if by you to On-Demand Publishing LLC, delivered via email to copyright@createspace.com with a copy to contracts-legal@amazon.com, and if delivered by you to Amazon Media EU S.à r.l., via mail or overnight carrier to Amazon Media EU S.à r.l., 5 Rue Plaetis, L-2338, Luxembourg. Notices will be effective and deemed received on the date transmitted or posted. We may sublicense the rights granted to us hereunder to our affiliates or to any third party designated or engaged by us and acting on our behalf for purposes of fulfilling our obligations or exercising our rights under this Agreement; provided, however, that we will remain ultimately liable for our compliance with this Agreement. You may not assign any of your rights or obligations under this Agreement. The failure of either party to enforce any provision of this Agreement will not constitute a waiver of the party's rights to subsequently enforce the provision. Any waivers granted hereunder are effective only if recorded in a writing signed by the party granting such waiver. If any provision of this Agreement is determined by any court or governmental authority to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present and that any partially valid and enforceable provisions be enforced to the extent that they are enforceable. The rights and remedies of the parties under this Agreement are cumulative, and either party may enforce any of its rights or remedies under this Agreement or other rights and remedies available to it at law or in equity. Nothing in this Agreement will act to restrict or otherwise limit any rights we may have in connection with the Content, or portions thereof, as provided under applicable law and any other permission from you. We will not be liable or otherwise responsible to you or any third party for any delay, default, or failure of performance arising out of any reasonably unforeseeable act, matter, cause, contingency or circumstance beyond our reasonable control, including, without limitation, any acts of God, third party acts or governmental action.

Exhibit 25 page 4